No. 3--08--0254
(Consolidated with No. 3--08--0255)

Filed September 8, 2008

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

| | | |
|---|---|---|
| In re C.L. and T.L., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Minors | ) | Peoria County, Illinois, |
| | ) | |
| (The People of the State of | ) | |
| Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 07--JA--281 and |
| | ) | 07--JA--282 |
| v. | ) | |
| | ) | |
| Elizabeth L., | ) | Honorable |
| | ) | Kim L. Kelley, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the opinion of the court:

The State filed two separate juvenile petitions alleging that the minors, C.L. and T.L.,

were neglected because of an injurious environment while in the respondent's care. At the time

of the petitions, the respondent mother, Elizabeth L. and the minors' father, Benjamin L., were

divorced. Pursuant to the respondent's and father's stipulations, the trial court adjudged the

children to be neglected. Following the dispositional hearing, the court elected not to make the

minors wards of the court but entered a written order following the dispositional hearing. The

order found the respondent unfit and father fit, granted guardianship of the children to the father,

and then closed the cases in Nos. 07 JA 281 and 07 JA 282. On appeal, the respondent argues that the court erred by giving guardianship of the minors to the father and then closing the cases. We affirm in part and vacate in part.

BACKGROUND

Initially, we note that the record provided to this court consists of: (1) the transcript of the adjudicatory hearing; (2) the transcript of the dispositional hearing; (3) an exhibit containing photographs of C.L.; and (4) four volumes of the common law record. Volume 1 of the common law record contains documents concerning C.L.'s case and volume 2 contains documents concerning only T.L.'s case. Volumes 3 and 4 of the common law record contain the following lengthy reports applicable to both minors in this case and three additional siblings:(1) the dispositional report covering August 22, 2007, to March 13, 2008; (2) the original "Addendum to Dispositional Hearing" covering March 13, 2008, through March 27, 2008, and a duplicate copy of the same original report; and (3) an "Addendum to Dispositional Hearing Report" covering the time from March 27, 2008, to April 2, 2008, the dates before the dispositional hearing. The trial court took judicial notice of the Peoria County file No. 01 JA 15, which has not been made part of this record.

By way of background, the petition asserts that mother has five children. Mother's two youngest children are the subject of this appeal. T.L., a female, was born on December 25, 2002, and C.L., a male, was born on December 2, 2005. Respondent married the father of T.L. and C.L. The dispositional report, discusses that the respondent and the father divorced after 19 months of marriage and that their marriage ended in 2006. Father's answer in the record

2

discloses the marriage was the subject of proceedings in Tazewell County in case No. 06 D 413, which remains an open case in that county.

The record contains a social history prepared by a clinical screener for the Department of Children and Family Services (DCFS) based on information collected in September of 2007. This social history, contained in this record on appeal, reveals that DCFS focused its attention on C.L. and T.L. after a mandated reporter observed C.L. to have multiple bruises in various stages of healing on his head, face, body and penis. He also had a "busted" lip and swelling to the left side of his nose. The record discloses C.L.'s injuries were photographed and he was taken to a physician on August 10, 2007.

The social history describes that the children were taken into protective custody, along with their three older siblings, on August 13, 2007. The three oldest children are not the subject of this appeal.

The social history reports that the court held a shelter care hearing on August 15, 2007, and placed the children in the temporary custody of their maternal grandmother, The same report discloses that the father of T.L. and C.L. later petitioned the court, on September 5, 2007, to vacate a portion of the August shelter care order and return the children to him. These shelter care orders are not documented in the record in either No. 07 JA 281 or No. 07 JA 282.

The common law record in this appeal begins with the State's petition requesting all of the children be made wards of the court and alleging the minors to be neglected because of an injurious environment. The petitions were filed by the State on November 29, 2007.

The record does contain a shelter care order dated November 29, 2007, wherein the court found probable cause for shelter care based on proffered evidence and by taking judicial notice of

3

Peoria County case No. 01 JA 15. The court continued the placement of C.L. and T.L. with their father while all other siblings remained with the maternal grandmother. On that date, the biological father of both T.L. and C.L. was personally present in court. However, the shelter care order shows the other fathers of the older siblings did not appear.

On November 29, 2007, the court conducted a first appearance with the father of T.L. and C.L., finding him to have legal status as the parent of T.L. and C.L. based on paternity test results. As previously stated, the father of T.L. and C.L. appeared in court on November 29, 2007. That same day, the father stipulated to the allegations in the petitions in his answer and waived strict proof thereof. In his answer, the father also wrote:

> "These minors are the subject of a child custody proceeding before another
> court and there is not a court order affecting custody or visitation. The
> other forum is Tazewell County Family Court case No. 06 D 413."

The first appearance with the other fathers was continued to another date.

The relevant portions of the State's juvenile petition in Nos. 07 JA 281 and 07 JA 282, filed on November 29, 2007, alleged that, while in the respondent's care, the children were neglected because of an injurious environment. The petition alleged that on August 10, 2007, a physician examined C.L. and observed C.L. to have bruising evident on his head, face, and nose, swelling on the left side of his face, a split lip, and a bruise on his penis. The petition alleged that mother explained the injuries occurred because C.L. bangs his head on the floor. She allegedly told the doctor that she would continue to allow this behavior based on another doctor's advice.

As to T.L., the petition alleged that a physician discovered a contagious form of

4

impetigo on her legs on August 10, 2007. The physician also observed another sibling to have a suspected fungal rash on her stomach.

The petition also alleged that on three separate dates in 2007, respondent delivered her children to the crisis nursery for care, stating on one of those occasions that she needed their services because one of her children ran into a window. According to the petition, on another occasion, mother stated that T.L. had a burn on a leg, and that on yet another occasion, respondent had been the victim of domestic violence. The petition further alleged that T.L. informed the crisis nursery staff that respondent's boyfriend tells her to bend over and he "beats" her.

The petition also recited that respondent had previous indicated reports for inadequate supervision of her children in 2000, for risk of harm in both 2001 and 2002, for inadequate shelter in 2004, and for inadequate supervision in March of 2007. The petition also noted the respondent's involvement in No. 01 JA 15 from February 2001 until January of 2003 and that the status of the oldest three siblings' fathers was "unfit" as determined by the court in No. 01 JA 15.

On February 28, 2008, mother filed an amended answer that stipulated that the State could prove the allegations of the petition asserting the children were neglected because of an injurious environment. The State dismissed the allegations set forth in paragraph "1.L" of the petition. The court requested and received a factual basis from the State and adjudged all five siblings to be neglected.

The factual basis recited by the State is included in the transcript of the proceedings and is also a part of this record. According to the factual basis, a physician

5

concluded that C.L.'s injuries were not consistent with head banging. The State offered photographic exhibits depicting C.L. with visible bruising. The factual basis described a physician's findings that T.L. had impetigo and another sibling had a rash on her stomach. The State described that the staff at the crisis nursery observed T.L. to have a burn on a leg evident during an intake at the center. The State described that mother reported to the crisis nursery staff that she was the victim of domestic violence and that T.L. also reported to the staff that in February of 2007 respondent's boyfriend, "Joe", beat T.L. after telling her to bend over.

As part of the factual basis, the State requested the court to take judicial notice of the file in No. 01 JA 15 and reported to the court the previous status of indicated reports involving mother and prior investigations by DCFS. Based on the matters recited into the record, the court found all five minors to be neglected as alleged in the petition and continued the matter for a dispositional hearing.

The dispositional hearing took place on April 3, 2008. This hearing concerned all five siblings, that is, C.L. and T.L. and three of the respondent's other children by two other fathers. At the conclusion of the hearing, after much discussion, the court orally pronounced its findings as they related to C.L. and T.L. The court found the father to be fit and stated that the court was closing C.L.'s and T.L.'s cases. The court went on to make the other three siblings wards of the court. The court's findings are included in a preprinted form order designated as "Form 466" in the lower left hand corner of the page. Mother filed a timely notice of appeal from the court's order.

ANALYSIS

6

Mother only appeals from that portion of the dispositional order that awards guardianship of the minors to their father and closes the juvenile case without making the minors wards of the court in Nos. 07 JA 281 and 07 JA 282. The State argues that the court's decision to avoid making the minors wards of the court was in the best interests of the minors and should not be set aside unless against the manifest weight of the evidence.

The proceedings in this case are governed by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1--1 *et seq*. (West 2006)). Under the Act, after the court determines that a child is neglected, the court is required to hold a dispositional hearing. 705 ILCS 405/2--21(2) (West 2006). At this hearing, the court must first determine whether the minor is to be made a ward of the court. 705 ILCS 405/2--22(1) (West 2006). Only after a finding that the minor should be made a ward of the court can the court issue a dispositional order affecting the future conduct of the parents. 705 ILCS 5/2--23(1) (West 2006). Likewise, the court's consideration of the need for guardianship and whether a parent is dispositionally unfit must be preceded by the court's finding that it is in the best interest of the minor to become a ward of the court. 705 ILCS 405/2--27(1)(a) (West 2006).

In this case, the trial court found T.L. and C.L. to be neglected, and then held the required dispositional hearing. Sometime after the hearing, the court signed and issued a written form order, titled as a dispositional order. The preparation of the order is not acknowledged in the transcript of the proceedings.

Regardless, the form order selected in Nos. 07 JA 281 and 07 JA 282, marked as "Form 466," included a preprinted finding that it was in the best interest of the children to be made wards of the court. However, in the lower portion of the preprinted form, the

7

judge did not mark the box that would have indicated the judge's intention to make both minors wards of the court. Importantly, the judge verbally announced on the record, in open court, that he was declining the request to make either T.L. or C.L. a ward of the court.

The court's verbal findings are set forth below:

> "Mr. L*** is fit per the report and all the evidence before the court. The question as to L*** is, do I close the case now, because I do feel the guardianship is appropriate in Mr. L*** as evidenced by that report, or do I keep wardship open for a period of time. And the court is going to find that Mr. L*** provides a stable environment. He provides permanency for the children. The children have been with him for a while and the court is going to adopt the recommendations of the guardian ad litem and the People and close this matter. "

Much later in the record the court states:

> " The court finds for all children, all three children, other than the L*** children, they need to be wards of the court and guardianship needs to be placed with the Department of Children and Family Services with right to place.
>
> As to L***, I'm closing that with some order of visitation to be ascertained after the lunch hour."

The best interest finding that was preprinted on the the form order was inconsistent with the lower portion of the same order where the judge did not mark the box making the minor's

8

wards of the court. The case law provides that in this situation, the court's verbal pronouncement controls over any conflict created by the written order. *In re K.L.S-P.*, 381 Ill. App. 3d 194, 195 (2008); *In re Taylor B.*, 359 Ill. App. 3d 647, 651 (2005). Thus, we conclude from this state of the record on appeal that the court did not make either C.L. or T.L wards of the court.

Juvenile court is a forum most caregivers do not desire to enter but are compelled to by circumstances beyond their control. In the context of neglect and abuse cases, the Juvenile Court Act allows the State to intervene in the decision making of parents, custodians, and/or guardians of children under very narrow circumstances. Those circumstances require a finding by the juvenile court judge that it is in the best interest of the children at risk to become wards of the court. Without this finding, the juvenile court doors remain closed, even after an emergency shelter care order has temporarily affected the placement of the children.

The juvenile court judge is not required to make every child a ward of the court based on the State's petition, but must selectively designate children to become wards of the court, who otherwise do not have a parent or parents who will act in the best interests of the children without some degree of court intervention.

When comparing the parental circumstances relevant to C.L. and T.L. to the circumstances of the other older siblings that were designated to become wards of the court, a distinction emerges that supports the court's ruling regarding T.L. and C.L. The fathers of the other siblings previously had been found unfit by the court in No. 01 JA 15 and that finding remained unchanged. Based on these circumstances, the trial court did not have the option of placing the oldest three siblings with a fit biological parent following the court's undisputed finding of mother's neglect. In contrast, the father of T.L. and C.L. had not previously been

9

found to be unfit and was not alleged in this petition as unfit and the court did not receive any evidence that he would be potentially abusive or neglectful.

Furthermore, the judge ordered the mother in this case to receive services to improve her parenting skills as part of the other dispositional orders entered in the related juvenile cases for her three oldest children. Additionally, the parties and the court discussed the fact that Tazewell County case No. 06 D 413 remained open and provided a forum for either parent of T.L. and C.L. to modify visitation and custody matters.

Although it is not clear from the record what the status of the custody orders were in No. 06 D 413, neither party requested either a transfer or the consolidation of the divorce and juvenile cases. As the court considered closing the juvenile files, the parties were very aware that once closed, the Tazewell County court that had exercised its jurisdiction to order the dissolution of the marriage could, if requested, decide issues related to custody and visitation.

In this case, the court did not make the decision regarding wardship lightly. The court's concern for the well-being of all five minors is evident of record. The court's working knowledge of lengthy exhibits, all filed with the court on the date of the dispositional hearing, is apparent from the transcript of proceedings. The court struggled with the desire to restore T.L.'s and C.L.'s family unit with mother and the other siblings by balancing this concern with the need to provide permanency to C.L. and T.L., who were doing well with their biological father.

In this case, the permanency goal for T.L. and C.L. to remain home with their biological father was part of the juvenile record. The reports submitted to the court as part of the dispositional evidence document that C.L. and T.L. are well adjusted in father's home and thriving as a result of the stability he has provided for the minors since September of 2007.

10

There is nothing in the record to suggest the court's decision to close the juvenile files and allow the divorce court to address the parental issues was unfounded or erroneous in light of the circumstances of this case.

Even though we observe the record supports the trial judge's decision to close the files before making the children wards of the court, the Juvenile Court Act does not require a court to enter any finding before closing a juvenile case at this stage. The structure of the Juvenile Court Act is premised on the fact that parents should be allowed to raise their children without intervention or the risk of termination of parental rights by the State, unless certain criteria are met.

Even when one parent is determined to be unfit under the Juvenile Court Act, and wardship arises, the other parent's rights are superior to the State's interest. *In re Ta.A.,* No. 3-07-0513, slip op. at 7 (July 7, 2008); *In re Ryan B.,* 367 Ill. App. 3d 517, 520 (2006). By analogy, when one parent is found dispositionally unfit and the other parent is without fault and willing to assume the role of parenting the children, a court may not interfere unless the court determines it is in the best interests of the minors to *become* wards of the court. That said, a biological parent has superior rights to the State and may step in to parent his or her children when the other parent for some reason can no longer properly exercise his or her parental responsibilities. Such is the case at bar.

After the court found the children to be neglected by mother, the children still had a biological father who was ready, willing, and legally able to step in to protect and provide for his children and by all accounts has done so. Mother does not dispute the temporary placement of the children with this father or the court's subsequent finding the children had been neglected.

11

No one has claimed that this father, who was divorced from mother, contributed to the injurious environment that resulted in the determination of neglect.

Parental rights exist unless voluntarily surrendered or involuntarily terminated. After the court closes the files, the parental rights of mother and father remain intact and both remain legal guardians of these children. It was not necessary to designate one or the other as guardian. In fact, without designating the minors to be wards of the court, the judge could not name a guardian. 705 ILCS 405/2-27(1) (West 2006). The portion of the order that names father as guardian exceeded the scope of the court's authority after closing the cases and must be vacated.

Moreover, the order of visitation exceeded the court's authority after the judge announced the decision to close the cases. The record shows the court and the parents desired to have the siblings stay in contact with each other and their mother at combined sibling and parental visits. The parties hoped these visits could be supervised by DeLisa Jo Dorelle/Munn, the designated supervisor of visitation. However, the record suggests the supervisor of visitation would not supervise visits without a written court order.

The single-page visitation order in this case included the case numbers for all five juvenile files corresponding to mother's biological children, including C.L. and T.L. While the court's purpose in including Nos. 07 JA 281 and 07 JA 282 in that visitation order with the other siblings is understandable, even the court was cognizant of the fact that closing the juvenile case would not prevent either father or mother from seeking a different schedule for visitation before the court in Tazewell County where their divorce occurred. To this end, the juvenile court judge said:

"I'm also going to look [at], as part of [mother's] service plan,

12

visitation with the children at the visitation center. So I want you to know that, but anything I do here won't stop her from seeking relief in the D case in Tazewell County."

We note, mother does not request that the visitation order should be set aside. In the context of this record, we do not view the order of visitation bearing all five juvenile case numbers as an expression of the court's intent to treat T.L. and C.L. as wards of the court. However, after closing the juvenile cases, the visitation order is unenforceable because neither T.L. nor C.L. is a ward of the court nor are their juvenile cases still open.

Dispositional decisions, such as visitation orders, findings of unfitness, and determinations of guardianship are statutorily predicated upon the court first making the minors wards of the court. See, *e.g.*, 705 ILCS 405/2--23(1), 2--27(1) (West 2006). The trial court's order regarding guardianship, which has been challenged by mother in this appeal, was unauthorized under sections 2-23(1) and 2-27(1). 705 ILCS 405/2-23(1),2-27(1)(West 2006). Related thereto, the trial court's consideration of dispositional unfitness was also premature and unauthorized, under section 2--27(1), since these children were not made wards of the court. See 705 ILCS 405/2--27(1) (West 2006).

Dispositional orders that are not authorized by statute are void and must be vacated. *In re D.W.*, 214 Ill. 2d 289, 309 (2005). Therefore, we vacate that portion of the order, challenged by mother in this case, granting guardianship of the minors to the father. Additionally, we vacate the court's findings in Nos. 07 JA 281 and 07 JA 282 declaring mother unfit and father fit.

The difficulty in this case stems from the failure to strike preprinted, but inapplicable, findings in this case and directly resulted from the missuse of a standardized form that was not

13

designed to be used in every case. While useful tools in the chaotic and emotional juvenile courtroom, form orders should not be used to delegate the task for making an accurate record to courtroom staff. This is a duty of the judge.

For the foregoing reasons, regarding the written order issued by the Peoria County circuit court on April 3, 2008, we: (1) affirm the trial court's decision to close these cases; and (2) vacate those portions of the written order granting guardianship of the minors to the father, finding mother dispositionally unfit and declaring father to be fit.

Affirmed in part and vacated in part.

O'BRIEN, J., concurs.

PRESIDING JUSTICE McDADE, concurring in part and dissenting in part:

The majority finds that because the children -- T.L., age 5, and C.L., age 2 -- were not made wards of the State, the trial court was without authority to enter its orders finding the mother unfit, finding the father fit, awarding guardianship of the children to the father, directing the mother to complete specified service tasks, and scheduling the mother's supervised visitation with the children. All of those orders have been vacated by the majority, and I concur with that action.

I also agree with the majority's conclusion that the trial court devoted a great deal of effort and attention and exhibited care and sensitivity in its consideration of these cases.

14

However, the majority affirms the order closing these cases and, for the reasons that follow, I dissent from that decision and would find that the matter needs to be returned to the circuit court and done over properly.  I do not think we can begin to responsibly assess whether the ultimate disposition of the children was correct because we have been presented with a procedural quagmire.

Father has been given custody of these children by the circuit court in *this* case.  The record contains a shelter care order issued on November 29, 2007.  Nonetheless, the dispositional report states that: (1) on September 5, 2007, the father filed a petition to vacate the shelter care order; (2) the petition was granted; and (3) the children were placed with the father.  The record does not contain either a petition by the father to vacate the shelter care order, or a court order granting such a petition and placing the children with the father.  Thus, the record is unclear about how and when and with what judicial findings the children *initially* went from custody of the mother to the custody of the father.

This placement with the father was confirmed in the dispositional order finding the father fit and declaring him guardian.  We have, quite properly I believe, vacated that finding of fitness and award of guardianship. Thus, one bottom line in this case is that we have custody awarded to the father

15

with no determination of record that he was a fit person to secure the children's release from shelter care or to be designated guardian.

Yet another bottom line is that we have a mother who has been stripped of custody on a determination that the children were neglected. There is now, however, no finding that she was unfit and no order of visitation or an opportunity to receive rehabilitation services necessary to reclaim C.L. and T.L.

For these reasons alone I do not believe we can responsibly affirm the order closing the cases.

Those are not, however, my only reasons. I am also concerned that we are being asked to review the propriety of closing these cases on a record lacking information critical to that review. As long as we cobble together bits and pieces of information, hoping that we have gleaned everything that is relevant, neither we nor the trial courts nor the parties will come to grips with the need for a complete record. Moreover, our increasing reliance on form orders where boxes are sometimes checked and sometimes not; where, as here, the form itself is internally inconsistent (at least to the extent of *requiring* (or presuming) a finding that it is in the best interest of the children to be made wards of the State, but also including a box permitting a contradictory finding); and where the written narrative findings demanded by the statute are non-existent is

16

troubling.  It deprives us of sufficient information to make well-reasoned and fair decisions on appeal, negatively impacting their reliability and compromising the legislature's stated goals.

Finally, the mother in this case will get state-provided services and visitation with C.L. and T.L., but only because of the other cases in which she is a party.  Absent those cases, the trial court's disposition leaves her with a finding that she is unfit, that she cannot have custody of her children, and that she will not have services necessary to reclaim them.  Our decision -- again, absent the other cases -- leaves her technically fit, but without her children and without resources to earn them back. That may be the appropriate disposition, but we cannot really tell from this record.

For all of these reasons, I cannot agree that the cases should remain closed and I dissent from that decision.